1   CARNEY WILLIAMS BATES
    PULLIAM & BOWMAN, PLLC
2   Hank Bates (Ca. # 167688)
    11311 Arcade Drive, Suite 200
3   Little Rock, Arkansas 72212
    Tel: 501-312-8500
4
    GOLOMB & HONIK, PC
5   Richard M. Golomb
    Ruben Honik
6   Kenneth J. Grunfeld
    1515 Market Street, Suite 1100
7   Philadelphia, Pennsylvania 19102
    Tel: 215-985-9177
8
    KU & MUSSMAN, PA
9   Brian T. Ku
    M. Ryan Casey
10  12550 Biscayne Boulevard, Suite 406
    Miami, Florida 33181
11  Tel: 305-891-1322
12  MILSTEIN ADELMAN, LLP
    Gillian Wade (Ca. # 229124)
13  Isaac Miller (Ca. # 266459)
    2800 Donald Douglas Loop North
14  Santa Monica, California 90405
    Tel: 310-396-9600
15
16  Attorneys for Plaintiffs Fredierick
    and Tasha Smith, on behalf of themselves
    and all others similarly situated
17

18              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
19                  SAN JOSE DIVISION

20
    TASHA SMITH and FREDIERICK        )   Case No.  5:12-CV-00222 EJD
22  SMITH,                            )
                                      )   **CLASS ACTION**
23                                    )
                                      )   **SECOND AMENDED CLASS
24          Plaintiffs,               )   ACTION COMPLAINT**
                                      )
25       vs.                          )   Violations of:
                                      )   (1) Cal. Bus. and Prof. Code §17200, *et
26  INTUIT, INC., a Delaware corp.,   )       seq.*; and
                                      )   (2) Cal. Bus. & Prof. Code §17500, *et
27          Defendant.                )       seq.*
                                      )
28                                    )   **JURY TRIAL DEMANDED**

COME NOW Plaintiffs Tasha Smith and Frederick Smith, on behalf of themselves and all others similarly situated, filing Plaintiffs' Second Amended Class Action Complaint against Defendant Intuit, Inc. Plaintiffs seek certification of their claims against Defendant as a class action. Plaintiffs allege, based on personal knowledge as to Defendant's actions and upon information and belief as to all other matters, as follows:

I.    **PARTIES**

1.    Plaintiff TASHA SMITH is a citizen of Arkansas. Mrs. Smith utilized Defendant's online tax preparation services and software and Defendant offered a Refund Processing Option transaction for Mrs. Smith during the class period.

2.    Plaintiff FREDERICK SMITH is a citizen of Arkansas. Mr. Smith utilized Defendant's online tax preparation services and software and Defendant offered a Refund Processing Option transaction for Mr. Smith during the class period.

3.    Defendant INTUIT, INC. is a Delaware corporation with its principal place of business and nerve center at 2700 Coast Avenue, Mountain View, California 94043.

II.    **JURISDICTION AND VENUE**

4.    This Court has jurisdiction over Defendant since its principal place of business is located in California. Further, at all relevant times Defendant has regularly and systematically transacted business within the State of California as a vendor of tax return preparation services and software. Defendant derives substantial revenue from California residents.

5.    The Court has subject matter jurisdiction over this class action under the Class Action Fairness Act ("CAFA") because there are more than one-hundred class members, more than two-thirds of the class members that are citizens of a State different from Defendant, and the aggregate of class members' claims is more than $5 million. 28 U.S.C. § 1332(d).

6.    Venue is also proper in this Court because the Defendant has numerous offices in this District. 28 U.S.C. § 1391(b)(1).

7.    Venue is further proper in this Court due to Defendant's Terms of Service with Plaintiffs and the Class, which states in part:

California state law governs this Agreement without regard to its conflicts of laws provisions.  To resolve any legal dispute arising from this Agreement, you and Intuit agree to the exclusive jurisdiction of state courts in Santa Clara County, California U.S.A. or federal court for the Northern District of California.

8.      Application of California law to the claims of Plaintiffs and all Class Members is appropriate.  The parties have chosen to apply California law to this dispute as evidenced by the choice-of-law provision.   Indeed, Plaintiffs' Causes of Action are plainly related to the contractual agreement between Plaintiffs and Defendant.  Both Plaintiffs and Defendant intended to apply California law to all disputes arising out of the customer relationship between Plaintiffs and Defendant.  Further, California has a substantial relationship to the parties as Defendant is headquartered in California and selected to have California courts as the forum for its disputes, and thus no state has a materially greater interest than California in the outcome of this dispute.  Also, it is Plaintiffs (who were the weaker party in the contract of adhesion containing the California choice-of-law provision) who seek to enforce the provision.  Finally, extraterritorial application of California law is also appropriate because the alleged unlawful and fraudulent business acts or practices occurred in and emanated from California.

9.      Application of California law further comports with due process.  Defendant does business in California, has its principal offices in California, a significant numbers of class members reside in California, and Defendant's agents or employees who prepared the advertising and disclosures at issue (upon information and belief) are located in California.   Further, customer service relating to Defendant's Refund Processing Option occurs (upon information and belief) in San Diego, California.  *See* Bank Refund Processing Agreement, Dkt. No. 33-3 at p. 3.

## III.    FACTS

### A.      E-Filing and the Electronic Tax Preparation Industry

10.     With the explosion of internet and personal computer usage, several companies in the 1990s began offering tax preparation and filing services to consumer taxpayers through tax preparation software.  In 2010, an estimated 35 to 40 million taxpayers used electronic tax

preparation products, either over the internet or on their desktop computers, to file a tax return with the Internal Revenue Service ("IRS").

11.     Tax preparation software consists of two basic components: a user interface which prompts users to provide relevant information and an underlying tax engine which processes the information.  The interface is similar to that with a live tax preparer.  Through a series of questions, consumers provide information to the software, which is then processed by the tax engine for calculation.  The tax engine is a complicated software program based upon federal and state tax codes and regulations.

12.     The cost of tax preparation software can vary, depending on a number of factors.  These may include the number of returns filed, whether the returns will be filed electronically ("e-filed"), whether the return is a federal or state return, the channel through which the consumer accesses the product (e.g., online vs. desktop software), and the amount of support the consumer desires for the process.

13.     The electronic tax preparation industry was turned upside down in 1998 by the Restructuring and Reform Act of 1998, which set goals to have at least 80 percent of all federal tax returns filed *electronically* by 2007.  To meet this 80 percent benchmark, the IRS developed a "Free File" program in 2001, whereby in theory the government would provide free e-filing services to the majority of taxpayers.

14.     But rather than develop its own software, the IRS decided to partner with established private sector firms.  In 2002, the Free File Alliance ("FFA") was formed, consisting of companies "engaged in the electronic tax preparation and filing industry" which included the major electronic tax preparation companies such as Defendant.  The FFA signed the Free Online Electronic Tax File Agreement with the IRS, whereby FFA members would provide free federal e-file services to individuals with an adjusted gross income ("AGI") equal to or less than that of 70 percent of all taxpayers for the prior year. In exchange for providing this service, FFA members (including Defendant) did not have to compete with free software provided by the IRS.  For the 2010 tax year, taxpayers with an AGI of $58,000 or less would qualify.  On Intuit's Free

File website, however, Intuit tells consumers that consumers with an AGI of $31,000 or less qualify (rather than $58,000), and then directs consumers who purportedly "don't qualify" to one of Intuit's paid products.  http://turbotax.intuit.com/taxfreedom/ (Oct. 18, 2011).

15.     Of course, providing a free service was not profitable, and the FFA had little incentive to make free filing publicized or accessible to consumers.  On the contrary, many FFA members including Defendant went to lengths to camouflage their free filing products.[1]  As a result, although 70 percent of taxpayers qualify for free e-filing, of the 26.3 million tax returns e-filed for the 2007 tax year, only 4 million (or 15 percent) were free returns filed through the FFA.[2]

## B.   **Intuit's TurboTax**

16.     Defendant is the nation's leading provider of electronic tax preparation and filing services, with revenues of $3.9 billion in the fiscal year ending July 31, 2011.[3]   Among Defendant's primary revenue generating products is tax preparation and filing software called "TurboTax".  In 2010, approximately 21 million federal tax returns prepared using TurboTax products were e-filed.

17.     In response to a series of questions, customers input information into TurboTax's software interface.  TurboTax's proprietary tax engine prepares the customer's taxes.  Following the completion of the electronic tax preparation services, Defendant offers customers the option to e-file their return or print out the return and mail it themselves to the IRS.

18.     In addition to a desktop version of the software, Defendant offers an online version ("TurboTax Online") where customers create an account and fill out their tax information

---

[1] Defendant has further undertaken massive lobbying efforts to block or repeal state legislation providing free tax filing on state tax returns, most prominently in California recently. *See* Dennis Ventry, *Intuit's end-run: Once again, it's targeting two free programs that help California taxpayers file their state returns*, L.A. Times, July 21, 2010, at http://articles.latimes.com/2010/jul/21/opinion/la-oe-ventry-intuit-20100721.
[2] U.S. Gen. Accounting Office, *Tax Administration: Many Taxpayers Rely on Tax Software and IRS Needs to Assess Associated Risks*, GAO-09-297 at 5 (Feb. 2009).
[3] Intuit Inc. Annual Report on Form 10-K at p. 3.

through a web-based program at Defendant's website. Customer information is stored online, at least through the current tax season, for access from multiple computers.

19.     Customers visiting the TurboTax webpage are presented with various TurboTax Online products, including the Free Edition, Basic, Deluxe, Premier, and Home & Business software packages.

20.     The poorly named TurboTax Online "Free Edition" is not free, for it requires additional fees (typically $19.95) to file a state return. According to Defendant's website, "TurboTax Online is free until you decide to file, e-file or print your return."[4]  At that point, customers must "purchase [the] TurboTax Online federal and state products."[5]

21.     While Defendant prominently displayed and aggressively marketed its not-free "Free Edition," it conceals from plain view what it calls its "Freedom Edition", which provides free e-filing for both federal and state tax returns (for states participating in the FFA). The "Freedom Edition," as opposed to the "Free Edition," is the free e-filing program that is the product of TurboTax's participation in the FFA, and subject to Defendant's agreement with the IRS. The Agreement, for example, requires Defendant to post links to free state filing programs from its free e-file website (in this case, "Freedom Edition") and does not allow for the types of financial products that are at the heart of this case.

22.     Defendant's marketing and presentation steered many customers qualifying for free federal *and* state filing away from the free "Freedom Edition" and toward the non-free "Free Edition."  Even if a consumer is able to find the "Freedom Edition" webpage, Defendant misrepresents the nature of the free e-filing program so eligibility appears more strict than it actually is.

---

[4]  Defendant Website, *Paying for TurboTax Online*, at http://turbotax.intuit.com/ support/iq/Working-on-My-Return/Paying-for-TurboTaxOnline/GEN12234.html?_requestid=99 538 (last accessed Oct. 11, 2011).
[5]  Defendant Website, *Get Your Refund Fast: Efile Your 2010 Taxes with TurboTax*, at http://turbotax.intuit.com/best-tax-software/why-choose-turbotax/start-now-finish-faster.jsp  (last accessed Oct. 11, 2011).

SECOND AMENDED CLASS ACTION COMPLAINT – 5:12-cv-00222 EJD

23.     Defendant for example represents that non-military customers only qualify if they "earned $31,000 or less [as] Your Adjusted Gross Income" or "qualify for the Earned Income Credit",[6] but the actual Free File program is open to taxpayers with a 2010 AGI (individual or combined) of $58,000 or less.

24.     Defendant also represents that individuals qualifying for Free File program "also qualify for FREE STATE filing in the following states: AL, AR, AZ, GA, IA, ID, KY, MI, MN, MO, MS, NY, NC, ND, OK, OR, RI, SC, VA, VT, WV.  If your state does not sponsor a Free File Program, you can still prepare and file a state return with the Freedom Edition for only $14.95 (credit card required)."[7]  Defendant failed to disclose the twenty-seven states that either offer free e-filing (CA, CO, CT, DE, DC, IL, IN, KS, LA, ME. MD, MA, NJ, NM, OH, PA, UT, and WI) or don't require state income tax return filing for W2 wage income (AK, FL, NV, NH, SD, TN, TX, WA, and WY).  In this way, Defendant steered lower income individuals (that did not have a credit card to pay what they thought would be state tax imposed fees) from one of those states back to its "Free Edition".

25.     Defendant sought to maximize participation in the "Free Edition" because it, unlike in the "Freedom Edition" context, was not proscribed from using predatory financing products (including the RPO product addressed herein), a major source of income for Defendant. While the FFA Agreement with the IRS contemplates reasonable payment for some state tax returns, it prohibits predatory financing products (the focus of Plaintiffs' complaint).

**C.     Disclosure Requirements Under the Truth In Lending Act**

26.     The Truth in Lending Act, 15 U.S.C. § 1601, *et seq*. ("TILA") and its implementing Regulation Z, 12 C.F.R. Part 226, establish requirements for accurate disclosure of interest rates and finance charges when creditors provide loans and/or extensions of credit to consumers.

---

[6] Intuit Tax Freedom Project webpage, http://turbotax.intuit.com/taxfreedom/ (last accessed Oct. 18, 2011).
[7] *Id.*

27.     Defendant is a creditor and Plaintiffs and Class Members are consumers for purposes of TILA.

28.     Through its Refund Processing Option ("RPO") scheme, Defendant regularly extends consumer credit (in connection with sales of TurboTax software and/or Defendant's tax preparation services) for which payment of a finance charge (the Refund Processing Service Fees, discussed *infra*) is required.  In order to defer payment of tax preparation fees, a customer must obtain an RPO and pay the Refund Processing Service Fee.  Unless the Refund Processing Service Fee is paid, Defendant would not extend credit.

29.     Further, it is Defendant (not its banking partner) to which the debts arising from the RPOs is initially payable and owed.  According to Defendant's Terms of Service (which apply to Plaintiff and the Class), in the event that the tax return is not sufficient to pay for Defendant's tax preparation fees, such fees are owed to Defendant and Defendant (not its banking partner)  then will proceed to debit the amounts owed from the preexisting bank account designated by the customer.  Thus, it is Defendant (not its banking partner) which collects RPO-related debts (the principal in the credit transaction).  *See* Intuit Terms of Service, Dkt. No. 33-7 at p. 8.

30.     In addition, a portion (if not the majority) of the finance charge is payable to Defendant (in addition to Defendant's banking partner).

31.     Thus Defendant is both a "creditor" in general and is also the "creditor" with respect to the RPO transactions.

32.     Violations of TILA are determined on an objective standard, based on the representations in the relevant disclosure documents, with no necessity to establish the subjective misunderstanding or reliance of particular consumers.

33.     A "finance charge" is defined to include "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."  12 C.F.R. § 226.4(a); *see also* 15 U.S.C. § 1605(a).  Finance charges within the meaning of TILA include fees and amounts charged by third parties where the

contracting party requires the use of a third party or where the creditor retains a portion of the third-party charge.   12 C.F.R. § 226.4(a)(1).

34.   Finance charges also include charges for "time price differential" as well as "service, transaction, activity, and carrying charges".   12 C.F.R. § 226.4(b).

35.   TILA and Regulation Z requires creditors such as Defendant to make the following disclosures (among others) clearly and conspicuously in writing before the consummation of the transaction:

      a.    the identity of the creditor making the disclosures (12 C.F.R. § 226.18(a)), 15 U.S.C. § 1638(a)(1);

      b.    the term "amount financed" and corresponding amount, which is calculated by determining the principal loan amount or the cash price less downpayments (12 C.F.R. § 226.18(b), 15 U.S.C. § 1638(a)(2)(A));

      c.    an itemization (or option to receive same) of the amount financed, including (where applicable) (1) amounts paid directly to the consumer, (2) the amount credited to the consumer's account with the creditor, (3) any amounts paid to other persons by the creditor on the consumer's behalf, including the identity of those persons, and (4) the prepaid finance charge (12 C.F.R. § 226.18(c), 15 U.S.C. § 1638(a)(2)(B));

      d.    the term "finance charge",[8] a brief description (such as 'the dollar amount the credit will cost you'), and the corresponding amount (12 C.F.R. § 226.18(d), 15 U.S.C. § 1638(a)(3));

      e.    the term "annual percentage rate," a brief description (such as 'the cost of your credit as a yearly rate'), and the corresponding amount, which is

---

[8] Further, the terms "finance charge" and "annual percentage rate", along with the corresponding amounts or percentage rates, shall be more conspicuous than any other disclosure, except the creditor's identity.  12 C.F.R. § 226.17(a)(2).

calculated in accordance with 12 C.F.R. Pt. 226, App. J (12 C.F.R. §§ 226.18(e), 226.22, 15 U.S.C. § 1638(a)(4));

36.     Congress declared that the purpose of TILA (and the disclosures it requires) is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit[.]"  15 U.S.C. § 1601.  To effectuate this purpose, "a court must construe 'the Act's provisions liberally in favor of the consumer and require absolute compliance by creditors."  *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009) (quoting *In re Ferrell*, 539 F.3d 1186, 1189 (9th Cir. 2008)).

37.     The purpose of TILA's regulations, likewise, "is to promote the informed use of consumer credit by requiring disclosures about its terms and cost."  12 C.F.R. § 226.1(b).  "Courts must defer to the decisions of the Federal Reserve Board and cannot apply '[t]he concept of 'meaningful disclosure' that animates TILA ... in the abstract.'"  *Hauk*, 552 F.3d at 1118 (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980)).

38.     Congressional intent is revealed in many places in the hearing record, but probably no more clearly than in the introductory remarks of Senator William Proxmire, the chief sponsor of the bill that ultimately became TILA:

> The first principle of the bill is to insure that the American consumer is given the whole truth about the price he is asked to pay for credit.  The bill would aim at full disclosure of the cost of credit so that the consumer can make intelligent choices in the marketplace…
>
> A crucial provision of the bill deals with expressing credit charges as an annual percentage rate.  Without the knowledge of an annual rate it is virtually impossible for the ordinary person to shop for the best credit buy…
>
> The second principle is that the whole truth about the cost of credit really is not meaningfully available unless it is stated in terms that consumers in our society can understand…Historically in our society that unit price for credit has been the annual rate of interest or finance charge…Without easy knowledge of this unit price for

credit, it is virtually impossible for the ordinary person to shop for the best credit buy…

A third principle is that the definition of finance charge, upon which an annual percentage rate is calculated, needs to be comprehensive and uniform.  It needs to be uniform to permit a meaningful comparison between alternative sources of credit…The definition of finance charge also needs to be comprehensive in order to convey the true cost of credit.

Introductory Remarks to S.5, Cong. Rec. S1202 (Jan. 1967) (remarks of Sen. Proxmire).

39.    The disclosures mandated by TILA have likely had a substantial affect on consumer behavior, as further evidence of their materiality.  For example, Congress found that in the years following the passage of the Act,

There is heightened awareness among consumers as to the cost of borrowing from various types of lending institutions.  Since 1969, those creditors who charge the highest interest rates have experienced a substantial reduction in their share of the consumer credit market.  While no conclusive proof of the Act's role in this exists, some experts believe Truth-in-Lending is a principal cause of this market shift.

S. Rep. 96-73, P.L. 96-221, 281 (1979).

40.    Thus Congress has made a determination that the disclosures required under TILA (including those which Plaintiffs allege Defendant failed to provide) are material.  Under TILA's statutory language, the term "material disclosures" is defined to include (in part) "the disclosure, as required by this subchapter, of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge,[and]  the amount to be financed[.]"  15 U.S.C. § 1602(v).

**D.    <u>Defendant's Illegal Conduct Regarding its Refund Processing Option</u>**

41.    Generally, the fees for Defendant's tax preparation and related services are due at the time a customer's taxes are prepared (and before they are electronically filed).

42.    At the conclusion of the tax preparation process, Defendant charges TurboTax Online users for the Defendant's tax preparation and filing services and software and any

additional services they might select.  In addition to paying immediately with a credit or debit card, Defendant provides the Refund Processing Option (RPO) of deferring payment of those fees until the tax refund has been received from the IRS, deducting these fees from the refund amount.  On information and belief, this component of these bank products expands the market for Defendant's tax preparation services, increases the amount that can be charged for electronic tax preparation services, and increases the fees collected by Defendant.

43.     Throughout the Class Period, Defendant sold RPOs in conjunction with banking partners.  Defendant marketed, facilitated, and sold an RPO product it referred to as "Refund Processing Services".[9]  This "Refund Processing" payment option was "formerly known as Refund Transfer —no matter what it's called, it's a method a processing your refund to deduct TurboTax fees."[10]  As used herein, "Refund Processing Option" and "RPO" refer to Defendant's practice of deducting fees from a consumer's federal tax return and encompass both Refund Processing and Refund Transfer, which are identical.

44.     It is Defendant (not its banking partner) that has advertised and has promoted RPOs.  It is also Defendant that in the course of providing its tax preparation service and software has offered the RPOs to its customers, provided the customers the (inadequate and uniform as to the Class) RPO disclosures, and obtained the signed RPO consent forms from the clients.

45.     Further, It is the Defendant (not its banking partner) that confirms a customer's eligibility for an RPO and conducts the credit risk investigation to determine whether the anticipated refund will cover the costs of the tax preparation fees and RPO fee finance charges.  The Refund Processing Service Fee is *not* charged for this credit investigation, but is rather a finance charge that is required for an eligible consumer to purchase an RPO.  The Defendant (not its banking partner) takes the risk that the amount charged may go unpaid (if the tax return is not

---

[9]  Defendant Webpage, "Using Refund Transfer or Refund Processing Services to Pay TurboTax Fees"; at http://turbotax.intuit.com/support/iq/Tax-Refund/Using-Refund-Transfer-or-Refund-Processing-Services-to-Pay-TurboTax-Fees/GEN12098.html (last accessed Jan. 3, 2012).
[10]  *Id.*

sufficient to cover the fees).  It is Defendant to whom the tax preparation fees (debt principal) are due if the tax refund is insufficient to cover the amount of the debt.

46.     For these reasons and others discussed throughout, Defendant is a creditor for purposes of the RPO transactions.

47.     During the Class period, Defendant, through its proprietary software, extended credit via RPOs to its customers (including the Plaintiffs and all members of the Class), following common practices and procedures and using uniform forms, applications and disclosures as described below.  RPOs entail the establishment of a deposit account at the participating bank[11] ("Deposit Account").  The Deposit Account is a non-interest-bearing account established for the sole purpose of receiving the consumer's federal tax refund and dispersing those funds in a limited manner.

48.     It is the Defendant (not the customer) who chooses the bank at which the customer's Deposit Account will be opened, and the forms are nearly identical regardless of the bank which Defendant utilizes.  The Defendant is the driving entity behind the extension of credit that occurs in an RPO transaction.

49.     The consumer cannot make any other deposits to the Deposit Account or direct any other withdrawals.  When the consumer's tax return is sent to the IRS, the Deposit Account is identified as the destination for any refund to which the consumer may be entitled.  Once the IRS is notified, the refund destination cannot be changed.  If for any reason the consumer's refund is not deposited in the Deposit Account or if the refund is less than anticipated based upon Defendant's tax preparation services and/or fees, the consumer is still liable to Defendant for the full amount of the extension of credit.

50.     When the consumer's tax refund is deposited into the consumer's Deposit Account, before any funds are disbursed to the preexisting bank account identified by the consumer, funds are disbursed to pay, among other things:

---

[11] During the Class Period, these banks were University National Bank of St. Paul, MN and Santa Barbara Bank & Trust.

a.   TurboTax Fees payable to Defendant which include the fees and charges related to the preparation, processing and transmission of the customer's tax return owed to Defendant;

b.   Refund Processing Fees or Refund Processing Service Fees (collectively, "Refund Processing Service Fees") (typically $29.95), a portion (if not the majority) of which are received by Defendant;

c.   Any other applicable debts owed including, for example, a $10 fee in the event that the customer provides incorrect banking information.

Any remaining funds are disbursed to the consumer by direct deposit to a preexisting checking or savings account identified by the consumer or, in some tax years, to a prepaid debit card.

51.   Defendant is the exclusive generator of RPO customers (including Plaintiffs and the Class) through its tax preparation software and RPO product marketing.  As noted herein, it is the Defendant (not its banking partner) that provides each critical step of the RPO process except for the administrative functions of establishing the customer's Deposit Account through which the federal refund is funneled and disbursing the funds once they hit the customer's account. Although the banking partner disburses the funds from the customer's Deposit Account, it does so acting under the authorization of the customer.

52.   With an RPO, Defendant grants deferral of payment for approximately 8 to 15 days (the time period needed to receive the tax refund).  Defendant provides no disclosure of the **quadruple-digit** interest rate or finance charge for the RPO in violation of TILA and California's consumer protection laws.  *See, e.g.*, U.S. F.D.I.C. Amended Notice of Charges for an Order to Cease and Desist, *In the Matter of Republic Bank & Trust Company, Louisville Kentucky*, dated May 3, 2011 at ¶ 34 ("By failing to disclose to taxpayers in the Assisted Refund transactions that the TRAF [deposit account fee] are finance charges for deferral of the tax preparation fees owed, the EROs [such as Defendant] have violated the written disclosure requirements under TILA on a nationwide basis in each Assisted Refund transaction").

53.     Defendant conditions a customer's use of the RPO upon their agreement to pay the Refund Processing Service Fee.  Unless a customer agrees to pay the fee, he or she cannot avail themselves of the RPO.  Simply put, in order to defer payment of tax preparation fees, a customer must obtain an RPO and pay the Refund Processing Service Fee.  The tax refund amount is only the security interest for the extension of credit for payment of the tax preparation fees.

54.     The Refund Processing Service fee is a finance charge for deferring the cost of tax preparation, and as such, the failure to disclose it as such is unlawful and deceptive under the UCL and FAL.

55.     Defendant receives a significant portion (if not the majority) of the Refund Processing Service Fees.

56.     RPOs include exorbitant finance charges that, when properly calculated in accordance with TILA often exceed 100% APR.  In many instances the APR exceeds 1,000%.

57.     Although a significant profit source to Defendant and other for-profit tax preparers, RPOs provide little to no value to consumers at predatory interest rates and fees.  Tax filers can usually get their federal tax refund in 8 to 15 days by direct deposit, without getting an extension of credit or paying any extra fees to companies like Defendant.  The IRS usually issues refunds by check within 21 to 28 days.

58.     Defendant markets RPOs to its customers for whom it provides tax preparation services, as fees from these predatory products accounted for significant profits of Defendant.

**E.      Factual Allegations as to Plaintiffs Tasha Smith and Frederick Smith**

59.     Mr. and Mrs. Smith filed a joint return, purchased an RPO from Defendant in 2011 for the 2010 tax year.  Plaintiffs utilized TurboTax Online's electronic tax preparation software on or around February 8, 2011.  Defendant estimated Plaintiffs' federal refund to be $6,708 (federal) and $1,070 (state).  Defendant e-filed Plaintiffs' taxes.

60.     Defendant's fee for these services was $86.90.  Plaintiffs did not pay this fee at

- 15 -

this time but deferred payment to be taken out of their tax refund, which would be direct deposited into a one-transaction dummy account (Deposit Account).

61.     Plaintiffs experienced the same misleading statements and lack of disclosures as the rest of the Class Members (described throughout).  As noted elsewhere, Defendant utilized standardized forms, screenshots, and disclosures for users of TurboTax online during the tax preparation process.

62.     Defendant charged Plaintiffs $29.95 to set up a Deposit Account to which the IRS deposited the tax refund of $6708.  Upon information and belief, Plaintiffs received their funds via direct deposit approximately 2 weeks after their return was filed.

63.     Plaintiffs purchased a RPO which entitled them to an approximate fourteen day extension of credit to cover the Defendant's electronic tax preparation and filing fee ($86.90). Thus $86.90 was the total amount financed or principal.

64.     The finance charge included the Refund Processing Service Fee ($29.95), though it was not disclosed as a finance charge.

65.     Defendant conditioned Plaintiffs' use of the RPO upon their agreement to pay the Refund Processing Service Fee.  In order to defer payment of the tax preparation fees, Plaintiffs had to obtain an RPO and pay the Refund Processing Service Fee.

66.     Thus Plaintiffs paid $29.95 (in finance charges) for an approximate 14-day extension of credit of $86.90.  The APR, properly calculated in accordance with TILA, was an exorbitant quadruple-digit interest rate.

67.     For their 2009 taxes, Plaintiffs similarly utilized Defendant's TurboTax Online tax preparation services for their refund, which Defendant calculated to be $6,605.  Defendant's fee for these services was $86.90.  Plaintiff deferred payment to be taken out of their tax refund, and Defendant, using the dummy account, deposited the funds in Plaintiffs' account in approximately two weeks for a cost of $29.95 which Defendant took out of Plaintiffs' refund.  Thus Plaintiffs in 2009 paid $29.95 in finance charges for an approximate 14-day extension of credit of $86.90.

68.     For their 2008 taxes, Plaintiffs similarly utilized Defendant's TurboTax Online tax preparation services for their refund, which Defendant calculated to be $11,493.  Like in 2010 and 2009, Plaintiffs deferred payment of Defendant's tax preparation fees to be taken out of their tax return.  Defendant, using the dummy account, deposited the funds in Plaintiffs' account in approximately two weeks for a cost of (upon information and belief) $29.95 which Defendant took out of Plaintiffs' refund.  Like the 2010 and 2009 tax years, Plaintiffs were charged exorbitant finance charges ($29.95) to defer payment of a small amount for a short-term period.

69.     Defendant failed to provide any disclosure regarding the APR or finance charges regarding these extensions of credit.

## IV.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

70.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action (Counts One through Five) for themselves and on behalf of a class defined as:

> All natural persons who after January 12, 2008 used TurboTax Online and utilized the Refund Processing Option provided by Defendant and Defendant's fees were deducted from the deposit account established for the Refund Processing Option transaction.

Specifically excluded from the Class are: (a) all federal court judges who preside over this case and their spouses; (b) all persons who elect to exclude themselves from the Class; (c) all persons who have previously executed and delivered to Defendant releases of all their claims for all of their Class claims; and (d) Defendant's employees, officers, directors, agents, and representatives and their family members.

### B.     Rule 23(a) Prerequisites

71.     **Numerosity.**   The Class is so numerous that joinder of all members is impracticable.   At this time, Plaintiffs do not know the exact size of the Class.   Based on information and belief, the Class is comprised of at least thousands of members so as to render joinder of all Class Members impracticable.

72.   **Commonality.**   Common questions of law and fact predominate over individual issues.   There is a well-defined community of interest in the questions of law and fact involved affecting members of the Class.   The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

a.   Whether the Refund Processing Service Fee is a "finance charge" within the meaning of TILA;

b.   Whether Defendant disclosed to consumers for which it facilitated RPOs the interest rate and/or finance charge, calculated as required by TILA;

c.   Whether Defendant's illegal violations of TILA constitutes an "unlawful" practice in violation of Cal. Bus. & Prof. Code §17200, *et seq.*;

d.   Whether Defendant's failure to provide the TILA disclosures constitutes a "fraudulent" practice in violation of Cal. Bus. & Prof. Code §17200, *et seq.*;

e.   Whether (independent of any TILA violations), Defendant's marketing and sales of the RPOs as a convenient payment option (when in fact it was a form of credit) constitutes a "fraudulent" practice in violation of Cal. Bus. & Prof. Code §17200, *et seq.*;

f.   Whether (independent of any TILA violations), Defendant's omission regarding the true expenses of the RPO (by failing to disclose as interest the cost with deferring payment of the tax preparation fees) constitutes a "fraudulent" practice in violation of Cal. Bus. & Prof. Code §17200, *et seq.*;

g.   Whether (independent of any TILA violations), Defendant's description of the RPO as a mere "payment option" (rather than as an extension of credit) (or by describing the finance charge as a "processing" or "service fee" rather than a finance charge), violates California's False Advertising Law, of Cal. Bus. & Prof. Code §17500, *et seq.*; and

h.   Whether Defendant's illegal violations of California's False Advertising Law constitutes an "unlawful" practice in violation of Cal. Bus. & Prof. Code §17200, *et seq.*

73.   **Typicality.**   Plaintiffs' claims are typical of the other Class Members' claims.   As described above, Defendant uses common practices, applications, forms and disclosures in

committing the conduct that Plaintiffs allege damaged them and the Class Members.  Defendant uniformly violated TILA, the UCL, and the FAL by engaging in the conduct as described above, and these violations had the same effect on each member of the Class.

74.    **Adequacy.**  Plaintiffs are adequate representatives of the Class because they fit within the class definition and their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs will prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs are represented by experienced and able attorneys.  Class counsel have litigated numerous class actions and complex cases, and Plaintiffs' counsel intend to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and Class counsel can and will fairly and adequately protect the interests of all of the members of the Class.

**C.    Rule 23(b) Prerequisites**

75.    Questions of law and fact common to the Class predominate over questions affecting only individual Members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages and/or restitution sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for the members of the Class to effectively redress the wrongs done to them on an individual basis.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts.

76.    Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

# V.   CAUSES OF ACTION

### A.   FIRST CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE §17200, *ET SEQ.* – <u>UNLAWFUL</u> BUSINESS ACTS AND PRACTICES (PREDICATED ON TILA VIOLATIONS)

77.     Plaintiffs incorporate by reference each of the foregoing allegations.

78.     Notably, for each RPO offered to Plaintiffs and the Class Members, Defendant violated TILA by failing to disclose *any* finance charge and interest rate.  Defendant's violations of TILA include, but are not limited to, the following:

> a.     Defendant failed to use the term "amount financed" with respect to Defendant's tax preparation and software fees;

> b.     Defendant failed to provide an itemization (or option to receive same) of the amount financed, including the amount credited to the consumer account with the creditor (the tax preparation and software fees);

> c.     Defendant failed to use the term "finance charge" with respect to Refund Processing Service Fee and did not disclose any finance charge whatsoever;

> d.     Defendant failed to disclose that the Refund Processing Service Fee was a finance charge for deferral of tax preparation and software fees;

> e.     Defendant failed to offer a brief description of the finance charge (such as 'the dollar amount the credit will cost you');

> f.     Insofar as Defendant (inadequately) disclosed the underlying numbers of the amount financed and finance charge (but without using those terms), such disclosure were not more conspicuous than any other disclosure;

> g.     Defendant failed to use the term "annual percentage rate" ("APR");[12]

---

[12]  It is no excuse that Defendant did not know precisely the term of the extension of credit (i.e., how many days it would take before the consumer received the federal refund).  Under the regulations, where any information necessary for an accurate disclosure is unknown to the creditor (e.g. the length of the term), "the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided to the consumer, and shall

h.    Defendant failed to provide any description of the APR (such as 'the cost of your credit as a yearly rate'); and/or

i.    Defendant failed to provide any number whatsoever expressing the APR of the extension of credit, and properly calculating the APR in accordance with TILA and Regulation Z.

79.    Defendant's violations of TILA are "unlawful" acts providing the basis for a finding of liability under the "unlawful" prong of Cal. Bus. & Prof. Code §17200, *et seq.*, independent of and separate from Plaintiff's other causes of action which are based upon a fraud theory.  This cause of action is not predicated on fraudulent activity.

80.    Defendant was not legally allowed to sell its tax preparation software and services lacking the TILA required disclosures.  Yet Defendant did exactly that, and in effect sold a product/service which is was not legally allowed to sell.  Defendant also collected finance charges which were not disclosed, and thus collected finance charges that it was not legally allowed to collect.

81.    Defendant's violations of TILA, which are "unlawful" acts violating the UCL, resulted in Plaintiffs suffering injury-in-fact and losing money.

82.    Plaintiffs and the Class suffered injury-in-fact caused by Defendant's TILA violations.  Plaintiffs had a legally protected interest (namely, disclosure of the finance charges and APR as calculated by and required by TILA), and Defendant's failure to provide such disclosures constituted a concrete, particularized, and actual invasion of this legally protected interest.

83.    Further, Defendant's TILA violations resulted in economic injury to Plaintiffs and the Class.  Plaintiffs (and the Class) paid Defendant for tax preparation services and/or RPOs that Defendant was not allowed to sell (without the TILA disclosures).  Plaintiffs (and the Class)

---

state clearly that the disclosure is an estimate."  12 C.F.R. § 226.17(c)(2)(i).  Further, Defendant was aware of the window for typical I.R.S. deposit, representing to customers that they deposit would occur between "8 to 14 days".  Dkt. No. 33-6 at p. 5.

further paid Defendant finance charges that Defendant was not legally allowed to charge (without the TILA disclosures).

84.     Plaintiffs and the Class Members are entitled to injunctive relief and restitution of any money which was acquired by means of Defendant's unlawful practices (i.e. the Refund Processing Service Fees that were not properly disclosed), in an amount to be proven at trial.

**B.     SECOND CAUSE OF ACTION:  VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. – <u>FRAUDULENT</u> BUSINESS ACTS AND PRACTICES (PREDICATED ON TILA DISCLOSURES)**

85.     Plaintiffs incorporate by reference each of the foregoing allegations.

86.     Defendant's deceptive omissions (which were required under TILA) alleged herein are objectively material to a reasonable consumer and have and/or are likely to deceive Plaintiffs, the Class Members, and other reasonable consumers.

87.     Plaintiffs would have behaved differently if they had been aware of the undisclosed information (which was required under TILA).  Had Plaintiffs been aware of the information in paragraph 79 (which was not disclosed in violation of TILA), they would not have purchased the RPO, and would not have paid the Refund Processing Service Fees.  In this sense, Plaintiffs paid more for Defendant's tax preparation services (by additionally paying the service fee) than they would have had the Refund Processing Service Fees been labeled as a finance charge.

88.     Rather than purchasing the RPO, had Plaintiffs been aware of the information in paragraph 79 (which was not disclosed in violation of TILA), they instead would have chosen another option of paying the tax preparation fees, such as paying with a credit or debit card.  The disclosed rate of interest on even high-interest credit cards is significantly lower than the undisclosed interest rate / finance charge on the RPO (and would result in no interest if the debt is paid off before the next credit card billing cycle).

89.     Further, by utilizing a personal credit card or debit card, Plaintiffs (and the Class Members) could have received the same service (the deferral of tax preparation fees) for a much

lower price (either no interest if paid in full or a much lower interest rate than the quadruple digit rate of the RPO).

90.    The undisclosed information in paragraph 79 (which was not disclosed in violation of TILA) is further information that would have been important to reasonable consumers.

91.    As noted in paragraph 39, Congress itself has determined that the information in paragraph 79 is material to a reasonable consumer and affects consumer behavior.

92.    Thus Defendant (by not disclosing the information required by TILA) has engaged in a "fraudulent" business act or practice in violation of Cal. Bus. & Prof. Code §17200, *et seq.*

93.    Independent of Plaintiffs' actual deception, reliance, and damage, Defendant's omissions described in paragraph 79 constitute a "fraudulent" business act because members of the public are likely to be deceived.

94.    Plaintiffs and the Class Members have been damaged as a result of Defendant's fraudulent conduct alleged herein, which caused Plaintiffs and the Class Members to pay the Refund Processing Service Fees that they would not have otherwise paid.  Plaintiffs and the Class Members are entitled to injunctive relief and restitution, in an amount to be proven at trial.

**C.    THIRD CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. – <u>FRAUDULENT</u> BUSINESS ACTS AND PRACTICES (NOT PREDICATED ON TILA DISCLOSURES)**

95.    Plaintiffs incorporate by reference each of the foregoing allegations.

96.    Independent of whether Defendant violated TILA, Defendant engaged in various deceptive acts and omissions constituting "fraudulent" business acts and/or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq.*  These fraudulent acts and omissions include, but are not limited to, the following:

   a.    Defendant "deceptively marketed [and sold the RPOs] as a convenience product [or merely a payment option], when in fact they are a form of

credit, i.e. a vehicle for deferring the cost of tax preparation." *The People of the State of California v. JTH Tax, Inc.*, No. CGC-07-460778 2009 WL 2251631;

b.     Defendant misrepresented the cost of Defendant's extension of credit (deferral for payment of tax preparation fees) as a service fee instead of interest on the extension of credit and/or finance charge; and/or

c.     Defendant failed to disclose clearly and accurately the expense of the RPO by, including but not limited to, failing to disclose as interest the cost associated with deferring payment of Defendant's tax preparation fees.

97.     Defendant's deceptive representations and omissions alleged herein are objectively material to a reasonable consumer and have and/or are likely to deceive Plaintiffs, the Class Members, and other reasonable consumers.

98.     Plaintiffs would have behaved differently had Defendant not engaged in the deceptive acts and omissions described in paragraph 97.  Specifically, had Plaintiffs not been exposed to these deceptive acts and omissions, Plaintiffs would not have purchased the RPO, and would not have paid the Refund Processing Service Fees.  In this sense, Plaintiffs paid more for Defendant's tax preparation services (by additionally paying the service fee) than they would have had Defendant's not engaged in the deceptive acts and omissions described in paragraph 97.

99.     Rather than purchasing the RPO, had Plaintiffs not been deceived by the omissions and misrepresentation described in paragraph 97, they instead would have chosen another option of paying the tax preparation fees, such as paying with a credit or debit card.  The disclosed rate of interest on even high-interest credit cards is significantly lower than the undisclosed interest rate / finance charge on the RPO (and would result in no interest if the debt is paid off before the next credit card billing cycle).

100.     Further, by utilizing a personal credit card, Plaintiffs (and the Class Members) could have received the same service (the deferral of tax preparation fees) for a much lower price

(either no interest if paid in full or a much lower interest rate than the quadruple digit rate of the RPO).

101.    Defendant's deceptive acts and omissions (described in paragraph 97) contain information that would have been important to reasonable consumers.

102.    Independent of Plaintiffs' actual deception, reliance, and damage, Defendant's deceptive acts and omissions (described in paragraph 97) constitute "fraudulent" business acts because members of the public are likely to be deceived.

103.    Plaintiffs and the Class Members have been damaged as a result of Defendant's fraudulent conduct alleged herein, which caused Plaintiffs and the Class Members to pay the Refund Processing Service Fees that they would not have otherwise paid.  Plaintiffs and the Class Members are entitled to injunctive relief and restitution, in an amount to be proven at trial.

**D.    FOURTH CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE §17500, *ET SEQ*. – <u>FALSE ADVERTISING</u>.**

104.    Plaintiffs incorporate by reference each of the foregoing allegations.

105.    Pursuant to Cal. Bus. & Prof. Code §17500, it is unlawful for any person or business to make untrue or misleading representations with regard to the services they advertise, with the intent of inducing customers to purchase services, among other things.

106.    Defendant is a "person" for the purposes of Cal. Bus. & Prof. Code §17506.

107.    Defendant, with the intent to induce consumers to purchase tax preparation services and RPOs, made and disseminated uniform, untrue and/or misleading statements to Plaintiff and the Class, which Defendant knew or reasonably should have known were untrue and/or misleading at the time the statements were made.  These statements were made over the internet during the tax preparation process, and included the statements and omissions described in paragraph 97, *supra*).

108.    Defendant's tax software interface made numerous misleading representations about the nature of the RPO transaction: by describing the RPO as a mere "payment option"

(rather than as an extension of credit) [Dkt. No. 33-6 at pp. 3-4]; by describing the finance charge as a "processing" or "service fee" rather than a finance charge [*Id.* at 5].

109.   Further, some of these representations / advertisements lacked the specific disclosures required by TILA of advertisements.  Namely:

a.   advertisements stating that Plaintiffs had to pay a $29.95 service fee (which is the rate of the finance charge) failed to state the rate of that charge expressed as an annual percentage rate, in violation of 15 U.S.C. § 1664(c); and

b.   advertisements stating the $29.95 service fee  (which is the dollar amount of the finance charge) failed to state the terms of repayment and the rate of the finance charge expressed as an annual percentage rate, in violation of 15 U.S.C. § 1664(d).

110.   These statements also constitute commercial messages promoting (directly or indirectly) a credit transaction (namely, the RPOs).

111.   Insofar as these statements are accurate on some level, they nonetheless misled Plaintiff (as well as reasonable consumers and the Class).

112.   Defendant's failure to follow TILA with respect to its advertisement also constitutes violations of Cal. Bus. & Prof. Code §17500.   Congress has determined that advertisements which do not contain the information required by TILA are *per se* misleading.

113.   In addition (and independent of and separate of Defendant's violations of TILA's advertising requirements), Defendant violated Cal. Bus & Prof. Code §17500, *et seq.* in that the advertisements misleadingly (and uniformly) failed to disclose the finance charge the RPO. Indeed, for each RPO, Defendant failed to disclose any interest rate or finance charge.  Each of these acts constitutes a violation of Cal. Bus. & Prof. Code §17500, *et seq.*, in that Defendant, with the intent to induce consumers to purchase tax preparation services and RPOs, has made and disseminated untrue and/or misleading statements, which it knew or reasonably should have known were untrue and/or misleading at the time the statements were made.

114.     The false and misleading statements and advertisements described herein were uniformly experienced by Plaintiffs and all Class Members, since they were built into Defendant's TurboTax Online web interface, which all users who used TurboTax Online and purchased the RPO used.

115.     Plaintiffs and the Class Members have been damaged as a result of Defendant's false advertising, which caused Plaintiffs and the Class Members to pay the Refund Processing Service Fees that they would not have otherwise paid.

116.     Rather than purchasing the RPO, had Plaintiffs not been deceived by the false statements, they instead would have chosen another option of paying the tax preparation fees, such as paying with a credit or debit card.  The disclosed rate of interest on even high-interest credit cards is significantly lower than the undisclosed interest rate / finance charge on the RPO (and would result in no interest if the debt is paid off before the next credit card billing cycle).

117.     Further, by utilizing a personal credit card or debit card, Plaintiffs (and the Class Members) could have received the same service (the deferral of tax preparation fees) for a much lower price (either no interest if paid in full or a much lower interest rate than the quadruple digit rate of the RPO).

118.     Independent of Plaintiffs' actual deception, reliance, and damage, the advertisements complained of herein are deceptive on their face, and extrinsic evidence of deception is unnecessary to establish liability.  A person of ordinary intelligence would not infer from Defendant's advertising and representations the true nature and cost of the RPO (relative to other credit options such as a credit card or debit card).

119.     Plaintiffs and the Class Members are entitled to injunctive relief and restitution, in an amount to be proven at trial.

**E.     FIFTH CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE §17200, *ET SEQ*. – <u>UNLAWFUL</u> BUSINESS ACTS AND PRACTICES (PREDICATED ON FRAUD / FALSE ADVERTISING)**

120.     Plaintiffs incorporate by reference each of the foregoing allegations.

121.    Defendant's violations of Cal. Bus. & Prof. Code §17500, *et seq.*, is an "unlawful" act providing the basis for a finding of liability under the "unlawful" prong of Cal. Bus. & Prof. Code §17200, *et seq.*

122.    Defendant's unlawful violations of Cal. Bus. & Prof. Code § 17500, *et seq.*, are objectively material to a reasonable consumer and have deceived and/or are likely to deceive Plaintiffs, the Class Members, and other reasonable consumers.

123.    Plaintiffs and the Class Members have been damaged as a result of Defendant's unlawful violation of Cal. Bus. & Prof. Code § 17500, *et seq.*, which caused Plaintiffs and the Class Members to pay the Refund Processing Service Fees that they would not have otherwise paid.

124.    Rather than purchasing the RPO, had Plaintiffs not been deceived by the false statements violating Cal. Bus. & Prof. Code § 17500, *et seq.*, they instead would have chosen another option of paying the tax preparation fees, such as paying with a credit or debit card.  The disclosed rate of interest on even high-interest credit cards is significantly lower than the undisclosed interest rate / finance charge on the RPO (and would result in no interest if the debt is paid off before the next credit card billing cycle).

125.    Plaintiffs and the Class Members have been damaged as a result of Defendant's unlawful violations of Cal. Bus. & Prof. Code §17500, *et seq.*  They are entitled to injunctive relief and restitution, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment in favor of themselves and the Class for the following:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure; that Plaintiffs are proper class representatives; and that the best practicable notice of this action be given to members of the Class represented by Plaintiffs;

B.      That judgment be entered against Defendant and in favor of Plaintiffs and the Class on the Causes of Action in this Complaint;

C.      That judgment be entered against Defendant finding that the conduct of Defendant is in violation of Cal. Bus & Prof. Code §§17200, *et seq.,* and §§17500, *et seq.*, and enjoining Defendant from continuing in such conduct;

D.      That judgment be entered against Defendant for injunctive and equitable relief, restitution, and compensatory damages in an amount to be determined at trial;

E.      That judgment be entered against Defendant imposing interest on damages;

F.      That judgment be entered against Defendant imposing litigation costs and attorneys' fees; and

G.      For all other and further relief as this Court may deem necessary and appropriate.

Plaintiffs demand a jury trial on all issues so triable.

DATED: January 3, 2013                         Respectfully Submitted,

**MILSTEIN ADELMAN, LLP**

By:  */s/ Gillian Wade*
Gillian Wade (Ca. # 229124)
gwade@milsteinadelman.com
Isaac Miller (Ca. # 266459)
imiller@milsteinadelman.com
2800 Donald Douglas Loop North
Santa Monica, California 90405
Tel: 310-396-9600

*and*

**CARNEY WILLIAMS BATES PULLIAM & BOWMAN, PLLC**
Hank Bates (Ca. # 167688)
hbates@carneywilliams.com
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
Tel: 501-312-8500

*and*

1   **GOLOMB & HONIK, PC**
    Richard M. Golomb
2   rgolomb@golombhonik.com
    Ruben Honik
3   rhonik@golombhonik.com
    Kenneth J. Grunfeld
4   kgrunfeld@golombhonik.com
    1515 Market Street, Suite 1100
5   Philadelphia, Pennsylvania 19102
    Tel: 215-985-9177
6
7   *and*

8   **KU & MUSSMAN, PA**
    Brian T. Ku
9   brian@kumussman.com
    M. Ryan Casey
10  ryan@kumussman.com
    12550 Biscayne Boulevard, Suite 406
11  Miami, Florida 33181
    Tel: 305-891-1322
12
    *Attorneys for Plaintiffs Frederick*
13  *and Tasha Smith and the Class*

14

15

16

17

18

19

20

22  <u>**CERTIFICATE OF SERVICE**</u>

23      I, Gillian L. Wade, am the ECF user whose ID and password are being used to file this

24  Second Amended Complaint.  In compliance with General Order 45, section X.B., I hereby attest

25  that I have on file the concurrences for any signatures indicated by a "conformed" signature (/S)

26  within this e-filed document.  A true and correct was also served via Overnite/ Federal Express

27  on the following parties:

28

1

MARK A. PERRY
AUSTIN V. SCHWING

2

**GIBSON, DUNN &**

3

**CRUTCHER LLP**
555 Mission Street, Suite 3000

4

San Francisco, CA 94105-2933
*Attorneys for*

5

*Defendant INTUIT, INC.*

6

SARAH BROWN HADJIMARKOS

7

**GIBSON, DUNN &**
**CRUTCHER LLP**

8

1881 Page Mill Road
Palo Alto, CA 94304-1211

9

*Attorney for*

10

*Defendant INTUIT, INC.*

11

JOSEPH RICHARD ROSE
555 Mission Street, Suite 3000

12

San Francisco, CA 94105
*Attorney for*

13

*Defendant INTUIT, INC.*

14

Dated: January 3, 2013                    By: */s/ Gillian L. Wade*

15

GILLIAN L. WADE
ISAAC MILLER

16

**MILSTEIN ADELMAN, LLP**
2800 Donald Douglas Loop North

17

Santa Monica, CA 90405
Telephone: (310) 396-9600

18

19

20

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT – 5:12-cv-00222 EJD